NO. 4-07-0115          Filed 4/3/08

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
| Plaintiff-Appellee | ) | Circuit Court |
| v. | ) | of Morgan County |
| NELSON A. YOUNG, | ) | No. 05CF136 |
| Defendant-Appellant | ) | |
| | ) | Honorable |
| | ) | Richard T. Mitchell, |
| | ) | Judge Presiding |

_____

JUSTICE MYERSCOUGH delivered the opinion of the court:

In July 2005, the State charged defendant, Nelson A. Young, with first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)); the charge was later amended to first degree murder under section 9-1(a)(2) of the Criminal Code of 1961 (Code) (720 ILCS 5/9-1(a)(2) (West 2004)). In July 2006, a jury convicted defendant of the amended first-degree-murder charge. In August 2006, the trial court sentenced him to 40 years' imprisonment. Defendant appeals, arguing that the trial court erred in allowing evidence of prior convictions. We affirm.

I. BACKGROUND

On July 21, 2005, the State charged defendant with first degree murder under section 9-1(a)(1) of the Code (720 ILCS 5/9-1(a)(1) (West 2004) (knows such acts will cause death)), alleging that on July 19, 2005, defendant stabbed Eva Mae Davis, killing her, knowing that his act created the strong probability of death or great bodily harm. On July 26, 2005, the charge was amended to first degree murder under section 9-1(a)(2) of the

Code (720 ILCS 5/9-1(a)(2) (West 2004) (knows that such acts create a strong probability of death or great bodily harm)), alleging that on July 19, 2005, defendant stabbed Eva Mae Davis, killing her, knowing that his act created the strong probability of death or great bodily harm, correcting the citation to be consistent with the charge alleged.

On June 29, 2006, the State filed a motion in limine to admit, inter alia, prior convictions of aggravated battery and aggravated assault and testimony from the victim of that assault. Defendant had pleaded guilty on both charges, the battery was committed with a knife, the assault victim was to testify that defendant threatened the victim with a knife, and defendant threatened that he was going to kill the victim.

On July 6, 2006, a hearing was held on the motion in limine. The State argued that the prior convictions and testimony should be admitted for reasons other than a propensity to commit crimes, that is, reasons such as intent, modus operandi, motive, and absence of mistake or accident. Defendant argued that the crimes were not similar enough to show modus operandi because, defendant asserted, the prior crimes were only similar to this charge in that a knife was used each time. Defendant argued as a result, the probative value would be outweighed by the prejudicial effect. Defendant conceded that if accident was asserted as a defense, the prior convictions might be admissible to show lack of accident, but defense counsel said no such defense was planned.

- 2 -

The trial court denied the motion, stating it would not allow the State to present defendant's prior convictions during the State's case in chief. The court cautioned, though, that were defendant to testify that the stabbing was a accident or that defendant otherwise lacked intent, the court would allow the State to use the evidence at issue to rebut defendant's testimony.

On July 11, 2006, the jury was selected, and the trial commenced the next day. The evidence showed that on July 19, 2005, defendant placed calls to his brother, John Young, and cousin, Joe Morgan, both in North Carolina. He told each that defendant and his girlfriend, Eva Mae Davis, had struggled after Eva had charged at defendant with a knife and that he had accidentally stabbed her in the heart, killing her. Defendant asked each for money so defendant could travel to North Carolina.

Morgan went to his local sheriff's office to report the crime. The North Carolina sheriff's office contacted the Jacksonville police department. Officers from Jacksonville went to defendant's residence, where they found the victim's body in a bed, covered with a sheet.

On July 19, 2005, Illinois State Police officer Michael Narish, a crime-scene investigator, was called to the scene to collect evidence. He testified that the victim's clothing did not have any blood on it and her remains appeared to have been cleaned, except for the bottom of her feet. In processing the scene, Officer Michael Narish found additional evidence, includ-

ing a filet knife.

Doctor Travis Hindman, a forensic pathologist, testified that he performed the victim's autopsy. Dr. Hindman testified the victim had a stab wound to her chest, which went through her lung and cut her heart. In his opinion, this wound was the cause of death, and it was possible that the wound could have been made with the filet knife found by Officer Michael Narish. The victim also had cuts on her left leg and left hand consistent with the sort of wounds a person would receive when the person is in a defensive posture, though Hindman was not certain the wounds were sustained as the victim defended herself. The blood on the bottom of her feet indicated that she was able to walk after being stabbed. Chemical tests also showed the presence of cocaine and marijuana in the victim. Dr. Hindman testified that marijuana could stay in the body for days while cocaine would be eliminated within hours.

Tracy Sulwer, an employee of the Illinois State Police, Division of Forensic Services, testified that she found defendant's bloody fingerprints on a phone and doorknob taken from the crime scene. Sulwer also testified that the only print that she could find on the knife was from the defendant.

Amanda Humke, a forensic scientist with the Illinois State Police crime lab, testified that she did deoxyribonucleic acid (DNA) analysis on blood samples found during the investigation. Humke testified that the DNA test performed on blood found on a telephone, doorknob, and shirt collected at the scene showed

- 4 -

that the blood was the victim's, while the shirt's tag had a mixture of blood consistent with the victim's and defendant's DNA.

Michelle Montgomery testified that she had a father-daughter-like relationship with defendant. Montgomery had dated defendant's son, and defendant had dated Montgomery's mother. Although neither of those relationships continued to July 2005, Montgomery and defendant had continued to keep in almost daily contact with each other. Montgomery testified that defendant had admitted, prior to the victim's death, to hitting the victim. Montgomery also testified that defendant told her that he would have to leave the victim or hurt her really bad, at one point saying that he would have to kill the victim to get away from the relationship.

Montgomery testified that defendant called her at about 7:30 a.m. on July 19, 2005, and asked her if she would keep in touch no matter what happened. Defendant also told her that he needed to leave town. Montgomery could hear the defendant and the victim arguing in the background. Montgomery told defendant that she was still in bed and would talk to him later. Montgomery tried to call defendant back but did not get through to him. Defendant returned Montgomery's phone call around 1:30 p.m. that day and said that he was trying to get in touch with his family in North Carolina. Defendant wanted Montgomery's help to get defendant to the bus station in Springfield. Defendant called back again about 2:15 or 2:20 p.m. and said he was on his way to

Montgomery's house, where he arrived about 2:30 p.m. Once there, defendant ate some food Montgomery made for him and made three or four phone calls. Montgomery knew that defendant placed the first of the phone calls to his daughter, Vanessa, telling his daughter that he was running out of time and needed to get out of town. Montgomery testified she did not know who else defendant called or what was said.

Montgomery testified that while defendant was still at her home, Montgomery received a telephone call from her sister. She told Montgomery defendant had killed the victim. Montgomery told defendant he had to leave, and defendant responded that only Montgomery could help him at that point, and he was going to explain but did not know how. Later the same day, there was a loud knock at Montgomery's door. Montgomery's boyfriend answered the door and about 12 people charged in, including the victim's family members. They asked where defendant was, found him, dragged him outside, fought with him, and the police came.

Defendant testified in his own defense. He testified that he and the victim had dated for about a year, occasionally living together, and that their relationship had ups and downs. Defendant testified he hit the victim two or three times on one occasion, but he described it as a mistake. Defendant explained the victim woke him up from being passed out drunk. Defendant testified that they both used crack cocaine regularly and smoked it together on July 18, 2005. The victim left defendant's house sometime that night. On July 19, 2005, defendant left in the

early morning to look for the victim so he could get his bicycle from her and ride to the store to get beer. He did not find her. He went to the store, bought a bottle of beer, and returned home to find the victim there.

Defendant testified that he went into the bedroom. Defendant and the victim had an argument because he wanted to go to sleep, and she wanted to go back to her house. Defendant testified that one of the victim's family members, L.A. Jackson, visited with the victim, and when Jackson left, the victim was upset and anxious to leave the house. The victim said that she had something to do and would do it with or without defendant. Defendant also testified that she had a sock tied around her leg in the area of the cut that Dr. Hindman testified about. Defendant said that he asked the victim about her leg, and she said she had cut her leg at her house. Defendant testified after that exchange, he heard a loud noise and went to the kitchen finding that the victim was attempting to leave the house through the back door. She had a knife in her hand.

Defendant testified that he told the victim to give him the knife. Defendant testified the victim charged him, drawing the knife back to the level of her head with her right hand while telling defendant he better get back. Defendant grabbed the victim's right arm with his left hand and took the knife from her. Defendant testified that they wrestled over the knife, she grabbed him, he fell with his back against her, then he turned around to find the knife was in her chest. The victim told

defendant to call an ambulance, then she fell and lost conscious-
ness. Defendant testified that he pulled the knife out of her
chest, carried her to his bedroom, attempted cardiopulmonary
resuscitation on her, and found that she was already dead. He
testified that, because she had died so quickly, he did not call
an ambulance.

Defendant testified that he then cleaned himself up,
and cleaned her body, put new clothes on her body, and covered it
with a sheet. Defendant called his daughter and Montgomery from
his house. At about 1:30 p.m., defendant rode his bicycle to
Montgomery's house. Defendant testified that once at Montgom-
ery's house he called his daughter a second time, and he called a
sister, brother, and cousin, telling each what was happening and
asking for money. Defendant testified he was scared to call the
police because he feared the victim's family would hear about
what had happened and kill him before the police arrived.
Defendant testified that he was hiding in Montgomery's kitchen
closet when about 12 people, including members of the victim's
family, came in the house, grabbed him, and beat him. He did not
remember anything else until three days later when he was in
jail.

After the defense rested, the State renewed its motion
in limine to admit the previous convictions in evidence and
permit testimony by the victim of the prior assault. The State
based its argument on the defendant's assertion that the stabbing
was an accident. The trial court allowed the State's motion with

respect to the prior convictions, which were stipulated to, but did not allow the victim of the previous assault to testify.

On July 14, 2006, both sides presented closing arguments. The jury deliberated for just under two hours before returning a verdict of guilty on the amended charge of first degree murder. On August 22, 2006, the trial court sentenced defendant to 40 years' imprisonment. This appeal followed.

## II. ANALYSIS

On appeal, defendant argues that the trial court erred in allowing evidence of defendant's prior convictions.

## A. Standard of Review

Whether to admit other-crimes evidence is within the trial court's discretion, and this court will not disturb that ruling absent an abuse of discretion. People v. Spyres, 359 Ill. App. 3d 1108, 1113, 835 N.E.2d 974, 978 (2005) (trial court's admitting evidence of receipt of other cannabis shipments affirmed where the defendant asserted that he was merely the roommate of a drug trafficker). A trial court abuses its discretion "'only where the trial court's decision is arbitrary, fanciful, or unreasonable or where no reasonable man would take the view adopted by the trial court.'" People v. Hayes, 319 Ill. App. 3d 810, 819, 745 N.E.2d 31, 40 (2001) (trial court's admitting evidence of theft of a maroon Chevrolet Caprice by the defendant where the defendant testified that he had no possession of that car at the time of the abduction at issue in trial), quoting People v. Illgen, 145 Ill. 2d 353, 364, 583 N.E.2d 515,

519 (1991).

## B. The Charge Was Amended To Make It Consistent
## With the Allegation

On July 21, 2005, the State charged defendant with first degree murder (720 ILCS 5/9-1(a)(1) (West 2004)). Although first degree murder as defined in section 9-1(a)(1) requires that the perpetrator intends to kill or do great bodily harm to the victim, the information alleged that on July 19, 2005, defendant stabbed Eva Mae Davis, killing her, knowing that his act created the strong probability of death or great bodily harm. On July 26, 2005, the charge was amended to first degree murder under section 9-1(a)(2), which is the citation consistent with the information as charged.

## C. The Trial Court Did Not Abuse Its Discretion by
## Admitting Evidence of Defendant's Previous Convictions

Defendant argues that the only similarity between this case and his prior convictions is use of a knife, and distinguishes the situations by pointing out that the victims of the two previous crimes were male and were not domestic partners of defendant. Defendant argues that while evidence of previous domestic abuse was relevant, and properly admitted, the prior crimes were irrelevant. However, because the prior convictions were admitted to show intent or lack of accident, mere general areas of similarity are sufficient. People v. Adams, 308 Ill. App. 3d 995, 1004, 721 N.E.2d 1182, 1188 (1999) (trial court's admitting evidence of the defendant's assaulting previous fiancée after she discovered the defendant was involved in a homosexual

relationship affirmed in case where the defendant on trial for murder asserted he accidentally killed current girlfriend).  A greater degree of identity would be required if the prior convictions were admitted to show modus operandi or that the crime was part of a common design or plan.  Adams, 308 Ill. App. 3d at 1003, 721 N.E.2d at 1188.

The trial court initially denied the State's motion to admit the other-crimes evidence when defendant was not expected to testify that the stabbing was an accident, but the court granted the motion after defendant testified that the stabbing was an accident.

Evidence of defendant's prior convictions was admitted for a purpose other than to show propensity.  The record shows the evidence of prior convictions was admitted for the limited purpose of showing the defendant's intent or lack of accident.

The trial court specifically noted it weighed the probative value of the evidence against its prejudice.  The court made its determination very near the end of the trial and was in the best position to weigh those factors in the context of the entire case.  The court did not abuse its discretion.  The court initially denied the State's motion to admit defendant's previous convictions until it became clear how they were probative.  That is, they were not admitted until they were relevant to disprove defendant's explanation of the stabbing as an accident.

Moreover, the trial court gave a limiting instruction with the jury instructions (Illinois Pattern Jury Instructions,

Criminal, No. 3.14 (4th ed. 2000)) that the other-crimes evidence was admitted only "on the issue of defendant's motive."  A limiting instruction reduces any prejudice created by admitting other-crimes evidence.  Hayes, 319 Ill. App. 3d at 820, 745 N.E.2d at 41.  The instruction successfully prevented the jury from considering the previous convictions as evidence of defendant's propensity to commit a crime.  People v. King, 165 Ill. App. 3d 464, 469, 518 N.E.2d 1309, 1313 (1988) (no reversible error where evidence of prior crime was admitted to show intent but limiting instruction referenced identification and design).

Other-crimes evidence is not admissible to prove a defendant's propensity to commit a crime but may be admissible to prove modus operandi, intent, identity, motive, or absence of mistake.  Spyres, 359 Ill. App. 3d at 1112, 835 N.E.2d at 977. Other-crimes evidence is also admissible as part of a continuing narrative of the event giving rise to the offense.  People v. Thompson, 359 Ill. App. 3d 947, 951, 835 N.E.2d 933, 936 (2005) (trial court's admitting evidence of earlier altercation affirmed where it provided context for the crime for which the defendant was being tried).

However, even if relevant, other-crimes evidence may be excluded if its prejudicial effect substantially outweighs its probative value.  Spyres, 359 Ill. App. 3d at 1112, 835 N.E.2d 977.  "Whether the probative value of other-crimes evidence is outweighed by its prejudicial impact is a determination left to the trial court's discretion, and we will not disturb that

- 12 -

decision absent a clear abuse of discretion." Spyres, 359 Ill. App. 3d at 1114, 835 N.E.2d at 979.

Defendant submits numerous cases to support his contention that the trial court erred in admitting other-crimes evidence. However, even defendant's cases demonstrate a reluctance to overturn a trial court's determination to admit such evidence. Indeed, only one case cited by defendant results in a reversal by the reviewing court. People v. Connolly, 186 Ill. App. 3d 429, 434-35, 542 N.E.2d 517, 521 (1989) (evidence of burglaries committed three years earlier not distinctive enough to prove modus operandi and not probative for any other permissible purpose).

The determination of "whether the evidence of other crimes is so closely connected with the main issue that it tends to prove the accused guilty of the crime for which he is being tried" is to be made based on the facts of each case. People v. Wilson, 46 Ill. 2d 376, 380-81, 263 N.E.2d 856, 859 (1970) (trial court's admitting evidence of the defendant's prior drug transaction with informant affirmed where the defendant asserted that drugs belonged to someone else and he did not know they were in his apartment). As in Spyres and Wilson, the other-crimes evidence was relevant in that it tended to negate defendant's contention that he lacked intent. While an innocent state of mind might be present in one instance, the more often it occurs with similar results, the less likely that it was without criminal intent. See People v. Charles, 238 Ill. App. 3d 752, 761,

606 N.E.2d 603, 610 (1992) (affirming admission of evidence that the defendant shot someone with a shotgun 15 minutes earlier to negate the defendant's assertion of self-defense). In this case, the trial court found the other-crimes evidence should be admitted because defendant was asserting that the stabbing was an accident. This court finds no reversible error.

### III. CONCLUSION

For the reasons stated, we affirm the trial court's admission of other-crimes evidence. As part of our judgment, we grant the State its $50 statutory assessment against defendant as costs of this appeal.

Affirmed.

APPLETON, P.J., and STEIGMANN, J., concur.